KARREN KENNEY – SBN 174872
Kenney Legal Defense
2900 Bristol Street, Suite C204
Costa Mesa, CA 92626
(855) 505-5588
karren.kenney@gmail.com

Attorney for Defendant

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>DAVID HERNANDEZ,<br>Defendant. | CASE NO. 22CR1913-BAS<br><br>**MOTION IN LIMINE TO EXCLUDE TESTIMONY OF GOVERNMENT DRUG EXPERT** |

**MOTION IN LIMINE TO EXCLUDE TESTIMONY OF GOVERNMENT DRUG EXPERT**

Comes now Defendant, David Hernandez, who hereby objects to the testimony of the government's proposed drug expert. Note, as of the date of this filing, the defense has not received any Rule 16 disclosure indicating the Government is seeking to use a drug expert. However, the defense anticipates the Government will try to propose testimony that will include the following:

1. Drug courier profile.

2. Modus Operandi.

3. Structure, operation and methods of Drug Trafficking Organizations (DTOs)

4. Unknowing drug couriers/blind mules.

5. Drug Value.

## FACTUAL BACKGROUND

Mr. Hernandez is charged in a single count indictment as follows::

> On or about June 7, 2022, within the Southern District of California, defendant DAVID HERNANDEZ did knowingly and intentionally import 500 grams and more, to wit: approximately 43.44 kilograms (95.76 pounds) of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, into the United States from a place outside thereof; in violation of Title 21, United States Code, Sections 952 and 960.

### A. The Government's Rule 16 Disclosure has not been provided is Deficient and it is anticipated that any untimely disclosed Government Drug Expert will not be qualified to be designated as an actual Drug Expert.

On May 2, 2023, the Government filed a Status Report in this case. (See ECF Document No. 30). In the Status Report, the Government indicated it would provide its Rule 16 disclosure by July 3, 2023. As of the time of this filing, the Government has not provided a Rule 16 disclosure. The defense reserves the right to challenge any drug expert and moves to exclude if the court allows a Rule 16 disclosure after the filing of this motion.

It is unclear what specific training and experience any alleged Government drug expert possesses and whether the experience will rise to the level of an "expert" as opposed to a just a law enforcement officer.

In addition, there was no report disclosed by the Government by any alleged drug expert. Based upon previous trials similar to Mr. Hernandez's, the Government usually provides charts and a brochure that the designated expert did not create. The documents a Government drug expert usually certifies as true and correct in Rule 16 disclosures are documents that the Government continues to simply reuse for similar drug cases. Given the non-disclosure of the Government Drug Expert, a designation after the time the Government previously stated it would be provided should be excluded.

**B. Any Testimony Offered by a Government Drug Expert Must Be Reliable**

The **proffered testimony of an expert must be reliable**, i.e., the expert's testimony reflects scientific knowledge, the findings are derived by the scientific method, and the work product amounts to "good science." *Daubert v. Merrell Dow Pharm*., 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert I*I") (citation and quotation signals omitted). Under Rule 702, before admitting expert testimony, "the district court must perform a 'gatekeeping role' [to] ensur[e] that the testimony is both 'relevant' and 'reliable.' " *Ruvalcaba-Garcia* , 923 F.3d at 1188 (citing *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786 ). This gatekeeping obligation "applies to all (not just scientific) expert testimony." *United States v. Hermanek* , 289 F.3d 1076, 1093 (9th Cir. 2002) (citing *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167 ).

*Daubert I* discussed several reliability factors, including testing, peer review and publication, known or potential rate of error, and general acceptance in the relevant scientific community. 509 U.S. at 592–94, 113 S.Ct. 2786. *Daubert* and *Kumho Tire* may be harder to apply when the expert testimony is "experience-

based" rather than "science-based." But any such difficulty cannot simply lead to a "that goes to weight, not admissibility" default. See *Nease v. Ford Motor Co.* , 848 F.3d 219, 230 (4th Cir. 2017).

Reliability becomes more, not less, important when the "experience-based" expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony. The Supreme Court has made it abundantly clear that reliability is the lynchpin—the flexibility afforded to the gatekeeper goes to how to determine reliability, not whether to determine reliability:

> [W]here [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline."
>
> ... The objective of [ Daubert 's gatekeeping requirement] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire* , 526 U.S. at 149, 152, 119 S.Ct. 1167 (third alteration in original) (citations and quotation marks omitted).

### C. The Court Should Not Allow Any Irrelevant Testimony to Be Offered by a Government Drug Expert

If the court allows and makes a finding that any future proposed Government Drug Expert is a qualified expert, the law still **requires the testimony meet the "fit" requirement of relevancy**, i.e., "it logically advances a material

aspect of the proposing party's case." *Id*. A court's determination of relevancy "must be 'tied to the facts' of [the] particular case.'" *Cooper,* 510 F.3d at 942 (quoting *Kumho Tire*, 526 U.S. at 150) (internal quotation signals omitted). The Ninth Circuit's "fit" requirement, is directed "primarily to relevance." *Daubert I*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id*. (internal quotations omitted).

However, the "fit" requirement is not merely a reiteration of the general relevancy requirement under Rule 402. *Daubert II*, 43 F.3d at 1321 n.17. Instead, such a determination is meant to take into account that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert I*, 509 U.S. at 595 (citation and quotation signals omitted). "Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that [the evidence] speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n.17.

This Court should exclude all such testimony as improper and prejudicial under the Fifth and Sixth Amendments, and FED. R. EVID. 401, 402, 403, 702, 703, and 704(b). In addition, the Court should exclude testimony for which the government has not provided notice.

### D. The Court Should Exclude Expert Testimony on Drug Courier Profile and "Modus Operandi"

The Ninth Circuit has forbidden the use of drug courier profile evidence in standard drug importation cases. See *United States v. Vallejo*, 237 F.3d 1008, 1017 (9th Cir.), amended, 246 F.3d 1150 (9th Cir. 2001). A "drug courier profile" is:

> a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics. The profiles are based on what investigating officers consider to be the most common characteristics of drug couriers—the characteristics they look for during investigations. Such testimony is generally used to link the behavior of the defendant to the behavior common in the courier profile.

*Id*. (internal quotation marks and citations omitted).

This type of evidence is impermissible, because the significant prejudice to the accused outweighs the negligible probative value of the testimony:

> Drug courier profiles are inherently prejudicial because of the potential they have for including innocent citizens as profiled drug couriers . . . . Every defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officials in investigating criminal activity. Drug courier profile evidence is nothing more than the opinion of those officers conducting an investigation . . . . We denounce the use of this type of evidence as substantive evidence of the defendant's innocence or guilt.

*United States v. Beltran-Rios*, 878 F.2d 1208, 1210 (9th Cir. 1989) (internal alterations, quotation marks, and citations omitted).

Even if offered to show a modus operandi, this Court should preclude expert testimony on drug courier profile. See *United States v. Lim*, 984 F.2d 331, 335 (9th Cir. 1993); *Vallejo*, 237 F.3d at 1017; *United States v. Lui*, 941 F.2d 844, 847-48 (9th Cir. 1991). Indeed, "the purpose of modus operandi testimony, to 'alert [the jury] to the possibility that combinations of seemingly innocuous events may indicate criminal behavior,' is precisely the reason why drug courier profile testimony is so dangerous." *Lui*, 941 F.2d at 847-48 (internal citation omitted).

Given that this is a simple, straight-forward importation case, the court should preclude the government from eliciting testimony regarding the profile of the typical drug courier.

### E. The Court Should Exclude Evidence Regarding the General Structure, Operation, and Methods of Drug Smuggling Ventures

The government is seeking to introduce expert testimony regarding the general structure, operation, and methods of drug smuggling ventures, including the different roles played by individuals associated with such ventures. But this Court should exclude such evidence, as the Ninth Circuit repeatedly has held that such testimony is not relevant and unduly prejudicial. *United States v. Varela-Rivera*, 279 F.3d 1174, 1179 (9th Cir. 2002); *United States v. McGowan*, 274 F.3d 1251, 1254-55 (9th Cir. 2001); *Vallejo*, 237 F.3d at 1015-17. Such testimony is hardly probative, because it says nothing about Hernandez or the actual investigation in this case. See *United States v. Pineda-Torres*, 287 F.3d 860, 865 (9th Cir. 2002) ("There is no direct evidence associating the defendant with a drug trafficking organization so the expert uses the 'blueprint' structure of international drug trafficking organizations as a means of doing so. Because '[c]riminal prosecutions cannot be blueprinted, but must be tailored to the charges and facts of each case in consideration of the individual rights of each defendant,' this method of imputing knowledge lacks any probative value and is impermissible. *Vallejo*, 237 F.3d at 1017."); but see *United States v. Torralba-Mendia*, 784 F.3d 652, 663 (9th Cir. 2015) (evidence about smuggling organization's methods may be admissible to prove existence of conspiracy when government charges defendant with a conspiracy). Moreover, it is highly prejudicial and fundamentally unfair, because it "improperly link[s] [the defendant] to a vast drug trafficking organization, unfairly imputing the organization's knowledge of the drug . . . to [the defendant]." *Vallejo*, 273 F.3d at 1018.

Indeed, even if the court allows the government to offer expert testimony on the operations of drug-trafficking organizations specifically to rebut a claim that Hernandez did not have knowledge of the drugs in their vehicle, the testimony would be improper. See *Pineda-Torres*, 287 F.3d at 864. In *Pineda-Torres*, the Ninth Circuit held that, regardless of purpose, in the average case such testimony is unduly prejudicial under Rule 403. See *id*. (citing *Vallejo*, 237 F.3d at 1016). It unfairly imputes specific knowledge to the defendant when knowledge is the central question before the jury. See *id*. at 865. Accordingly, the Court should preclude testimony regarding the general structure, operation, and methods of drug smuggling ventures.

### F. The Court Should Preclude Expert Testimony Regarding "Unknowing Couriers" or "Blind Mules"

The government may seek to introduce testimony concerning the "modus operandi" of drug trafficking organizations. In addition, the government may also try to introduce testimony regarding unknowing couriers or "blind mules" if the defense "opens the door." The purpose of this testimony is to show that narcotic traffickers do not entrust large and valuable quantities of narcotics to unknowing couriers. In other words, the government will use this testimony to argue that Hernandez must have known about the drugs, and therefore is guilty, because other completely unrelated people, in unrelated cases, knew about the drugs hidden in their vehicles.

Such testimony should be excluded, for at least three different reasons. First, the testimony is demonstrably false, hardly probative, and highly prejudicial, and thus runs afoul of Rules 401 and 403. Indeed, as the Ninth Circuit has noted, the government should not "present expert testimony from law enforcement officials to the effect that drug traffickers do not, and would not ever, utilize blind mules to import large quantities of drugs into the United States . . . . [S]uch a

statement would not be truthful." *United States v. Venegas-Reynoso*, 524 F. App'x 373, 377 (9th Cir. May 17, 2013). Second, the testimony is a direct comment on the ultimate issue—Hernandez's knowledge—and thus is improper under Rule 704(b). Finally, the government's expert notice/discovery is woefully insufficient.

1. Rule 401/403

Hernandez objects to any expert testimony suggesting that drug-trafficking organizations do not use unknowing couriers, because the government knows or should know that such testimony is, at best, highly misleading. Recent investigations by the government have established that drug-trafficking organizations regularly use people to smuggle drugs without their knowledge. Thus, any purported expert testimony to the contrary would mislead the jury and should be excluded under Federal Rule of Evidence 403.

Indeed, the United States Attorney's Office in this district represented to the Ninth Circuit that it would "no longer put[] on testimony to the effect that blind mules do not exist." *United States v. Flores*, 510 F. App'x 594, 594 (9th Cir. Feb. 26, 2013). This is because, as detailed in the exhibits attached to this motion, the use of unknowing couriers to smuggle drugs is now widely accepted. The myriad schemes using innocent people as unwitting drug couriers have been detailed in official government memoranda, affidavits from federal law enforcement officials, and a variety of news reports.

In fact, the United States Attorney's Office has released a memorandum illustrating one particular scheme in which people were told they were transporting money, but were instead used to transport drugs into the country, without their knowledge. (See Exhibit A – Discovery Bates 171-173 in this case). The examples listed in Exhibit A clearly demonstrate that drug-trafficking organizations do use unknowing couriers to smuggle drugs.

Given that drug-trafficking organizations do use unknowing couriers, the government should not be permitted to elicit testimony that they do not. See *Flores*, 510 F. App'x at 594 ("We trust that the government will not submit expert testimony that it knows is inaccurate."); see also *United States v. Torres*, 794 F.3d 1053 (9th Cir. 2015). To allow such testimony would be to sanction the presentation of clearly misleading evidence in the guise of expert experience. Plainly this is improper. See *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 595 (1993) ("'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" (citation omitted); cf. *United States v. Kojayan,* 8 F.3d 1315, 1319 (9th Cir. 1993) ("More significantly, we're taken aback by the government's assertion that it is ever fair advocacy for a lawyer to make false statements in court.") (emphasis added, internal quotation marks omitted).

Although the government may claim that unknowing-courier testimony is generally admissible, this is simply not the law. See *United States v. Sepulveda-Barraza*, 645 F.3d 1066, 1070 (9th Cir. 2001) (amended) (per se rules of admissibility for this type of testimony "would be inconsistent with the case-by-case approach mandated by Federal Rule of Evidence 403."). Rather, under a proper Rule 403 balancing, such testimony should be excluded.

In *Varela-Rivera*, for instance, the defense "was based entirely on the contention that [the defendant] did not know the drugs were in the car." 279 F.3d at 1177. Thus, knowledge was clearly at issue, just as in this case. The government introduced general evidence about drug smuggling organizations, as well as expert testimony that "a drug smuggler would not risk using an unknowing courier to transport drugs." *Id*. The Ninth Circuit held that such evidence "should have been excluded pursuant to Rules 401 and 403 of the Federal Rules of

Evidence." *Id*. at 1179. In other words, the testimony—including unknowing courier testimony—was irrelevant (Rule 401) and unduly prejudicial (Rule 403). See *id.*

In *United States v. Salas-Rivera*, Judge Huff granted the defense a new trial based on the government's introduction purported expert testimony that drug trafficking organizations do not use unknowing couriers. See Gov. Br., 2011 WL 2532622, at *3 (filed June 21, 2011). Judge Huff found that the testimony was improper under Rule 403. See *id.* The government appealed and the Ninth Circuit affirmed. *United States v. Salas-Rivera*, 472 F. App'x 684, 684 (9th Cir. Apr. 19, 2012). The Court held that "the district court acted within its discretion in concluding that the expert testimony was unduly prejudicial under Fed. R. Evid. 403 and likely resulted in a miscarriage of justice." *Id.*

In contrast to *Varela-Rivera* and *Salas-Rivera*, the cases that have allowed unknowing courier testimony have done so only under specific circumstances—something beyond the defendant merely denying knowledge—that are not present here. And those cases were decided without the benefit of the information that the government has recently learned about the existence of unknowing couriers. In *United States v. Cordoba*, for instance, "the government's expert testified that sophisticated narcotics traffickers do not entrust 300 kilograms of cocaine to someone who does not know what he is transporting." 104 F.3d 225, 229 (9th Cir. 1997). While the Ninth Circuit allowed this testimony, it expressly explained that it "was properly admitted to assist the jury in understanding modus operandi in a complex criminal case." *Id*. at 230 (emphasis added).

In *Murillo*, the government offered expert testimony on the modus operandi of couriers involved in drug trafficking organizations, including that "drug traffickers do not entrust large quantities of drugs to people who are unaware that they are transporting them." 255 F.3d at 1176. Although the Ninth Circuit affirmed, it did so because Mr. Murillo opened the door to the testimony, by

"designat[ing] a fingerprint expert before trial and argu[ing] in his defense at trial that no fingerprints were found on the drug packages." *Id*. at 1177; see also *McGowan,* 274 F.3d at 1254-55 (explaining that the basis of Murillo was the fact that the defendant in Murillo opened the door).

Echoing *Murillo*, the Ninth Circuit's now-amended decision in *Sepulveda-Barraza* makes clear that its allowance of unknowing courier testimony was largely determined by the fact that the defendant designated and called an expert to testify that drug traffickers do use unknowing couriers. See 645 F.3d at 1072. Indeed, the Court specifically held, "[b]ecause [the defendant] provided notice that he would call an expert to testify regarding drug trafficking organizations' use of unknowing couriers, [the government expert's] testimony made it less probable that [the defendant] was acting as an unknowing courier, and therefore the evidence was relevant." *Id.*

Here, unlike *Cordoba*, the jury is not faced with a complex criminal case. Moreover, unlike *Murillo* and *Sepulveda-Barraza*, Hernandez has not designated any experts. Thus, there is no special circumstance that could arguably justify the admission of such testimony. There is, however, significant concern for unfair prejudice. In addition to the fact that the government has actual evidence that unknowing couriers are used by drug traffickers, the proffered testimony is also prejudicial because it allows the government to introduce, through an "expert" law enforcement official, strong evidence of guilt that has nothing whatsoever to do with the actual evidence against them, i.e., Hernandez must have known, because other completely unrelated people knew. Such testimony is hardly probative, highly prejudicial, and basically unfair. See *Vallejo*, 237 F.3d at 1018.

Additionally, unknowing courier testimony is unfairly prejudicial because, no matter how narrowly tailored, it necessarily links the defendant to a larger drug trafficking organization. If such organizations only use couriers who know what they are doing, by implication, the defendant must know they are working for a

drug trafficking organization and thus must be a part of that organization. Evidence conveying such implication has been specifically rejected on Rule 403 grounds. See *Vallejo*, 237 F.3d at 1018. As noted in *Vallejo*, testimony "regarding the fee paid to couriers within drug trafficking organizations" is inadmissible under Rule 403, because it "improperly link[s][the defendant] to a vast drug trafficking organization, unfairly imputing the organization's knowledge of the drug in the cars to [the defendant]." 237 F.3d at 1018. This reasoning is equally applicable to the proffered unknowing courier testimony here, which always links the defendant to some larger organization.

This Court, therefore, should preclude any expert testimony regarding unknowing couriers under Rule 403.

2. Rule 704(b)

Allowing the government to introduce expert testimony that drug-trafficking organizations do not use unknowing couriers would also violate Rule 704(b). See, e.g., *United States v. Gutierrez-Farias*, 294 F.3d 657, 662-63 (5th Cir. 2002); *United States v. Ibarra*, 493 F.3d 526, 532 (5th Cir. 2007). Rule 704(b) provides: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." FED. R. EVID. 704(b).

Unknowing courier testimony offends this rule: if all couriers know there are drugs hidden in their cars, it necessarily follows that the defendant also knew—i.e, had the requisite mens rea. For this reason, the Fifth Circuit rejects such testimony under Rule 704(b). In *Gutierrez-Farias*, 294 F.3d at 658-59, federal agents found marijuana in the tires of a tractor being towed on a pickup truck and the defendant denied knowledge. The government's proposed expert testimony included a description of the different roles and hiring practices in drug-trafficking organizations. See id. at 661-62. When the expert testified, they talked about the

need to trust the courier, and concluded, "just as in any other business, the people need a certain amount of credentials, if you will, to be employed or to be sought out by a narcotics trafficking organization." *Id*. at 662.

The Fifth Circuit held this testimony violated Rule 704(b): "The clear suggestion of [the agent's] testimony is that, because most drivers know there are drugs in their vehicles, [the defendant] must have known too. Although admittedly [the agent] did not say the magic words—'In my expert opinion [the defendant] knew the marijuana was in the tires'—we believe his testimony amounted to the functional equivalent of such a statement." *Id*. at 663.

In *Ibarra*, 493 F.3d at 532 (5th Cir. 2007), the Fifth Circuit applied its Rule 704(b) analysis specifically to unknowing courier testimony. There, "the district court allowed [a] DEA Agent . . . to testify that in his experience he had never seen a courier entrusted with an amount of cocaine of that size (worth approximately $4 million) without the courier knowing that he was carrying something illegal." Id. Reversing, the court made clear that such testimony was improper under Rule 704(b) because it commented upon the ultimate issue. See id.; accord *United States v. Ramirez-Velasquez*, 322 F.3d 868, 879 (5th Cir. 2003) ("The government goes too far in soliciting the functional equivalent of an opinion whether the defendant knew he was carrying drugs."); *United States v. Mendoza-Medina*, 346 F.3d 121, 129 (5th Cir. 2003) (finding that district court abused its discretion in admitting agent's testimony involving "generalized statements regarding distributors having to trust their couriers and include[ing] the profile that couriers often bring their wives and children along.").

Here, the testimony that drug traffickers do not use unknowing couriers would be equally the "functional equivalent" of telling the jury that Hernandez knew of the drugs. This would be an improper comment on the ultimate issue.

The government will likely argue that *Murillo* reached the opposite conclusion. But this is misleading, as *Murillo* contains little by way of analysis. The entirety of its reasoning is contained in four sentences:

> Under Rule 704(a), experts are allowed to give their opinions regarding ultimate factual issues. A limited exception to this general rule exists in criminal cases in that expert witnesses may not testify as to the mental state of a defendant in a criminal case when the mental state constitutes an element of the crime charged. Here, the prosecution limited its questioning to (1) whether in Agent Delaney's experience, drug traffickers entrusted thousands of dollars of drugs to couriers who did not know they were transporting them and (2) why, in his experience, traffickers did not do so. Because this limited questioning only evoked expert testimony as to Agent Delaney's experience with drug traffickers and not any 'explicit opinion' of Murillo's state of mind or knowledge of his transportation of drugs, we hold that the expert testimony here did not violate Rule 704(b).

*Murillo*, 255 F.3d at 1178 (quotation marks and citations omitted).

Notably, *Murillo* did not consider that unknowing courier testimony is the functional equivalent of testimony as to the ultimate issue of a defendant's state of mind. See *United States v. Morales*, 108 F.3d 1031, 1033, 1037 (9th Cir. 1997) (en banc) (holding that Rule 704(b) is violated if the expert's testimony "necessarily impl[ies] the mens rea element."). As such, it cannot control the outcome of this case. See *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985) ("unstated assumptions on non-litigated issues are not precedential holdings binding future decisions."); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the

attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.”). Accordingly, this Court should not permit the government’s proposed unknowing courier testimony.

3. Notice / Discovery

Finally, the proffered unknowing courier testimony should be not be permitted, because the government has failed to provide adequate notice and discovery. This lack of notice/discovery is improper. FED. R. CRIM. P. 16(a)(1)(G).

The newly amended Rule 16 discovery requirements safeguard important constitutional rights that will be eviscerated if the government is allowed to put on expert testimony without giving the defense a genuine opportunity to test the proposed evidence and respond. See *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). The Sixth Amendment right of an accused to confront the witnesses against them includes the opportunity for adequate and effective cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315 (1974). See, e.g., *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir. 1993) (“We cannot overemphasize the importance of allowing full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case.”). These guarantees are meaningless if the government can put on expert testimony with an unknown -- and therefore unassailable -- factual basis and methodology.

The government, therefore, must provide substantive and comprehensive discovery—the discovery necessary to give the defendant a fair opportunity to test the merits of the expert’s testimony through focused cross examinations—before any of its experts should be permitted to testify. Nothing provided by the government has come close to satisfying this rule. For instance, because the proposed expert here will likely rely on prior interviews with drug couriers in other cases, all reports related to such interviews must be—but have not been—produced.

At a minimum, Hernandez is entitled to discovery as to whether: (1) statements from prior interviews were confirmed or disproved by the outcome of those cases; (2) previous interviewees/suspects pleaded guilty, or exercised their trial rights; (3) if they went to trial, they were found not guilty; (4) the opinion is based on information relayed by the expert's colleagues engaged in other investigations; and (5) the opinion is based on personal knowledge gained from infiltrating a drug organization. Without knowing the answers to such questions, meaningful cross-examination is impossible, and Hernandez's right to a complete defense is compromised.

Only comprehensive discovery regarding the bases of any proposed expert's opinion will allow Hernandez to exercise their constitutional rights by subjecting the proposed testimony to rigorous testing and expose to the fact-finder relevant and discrediting information. Accordingly, because the government has not provided the requisite disclosures, its proposed expert testimony must be excluded.

### G. The Court Should Preclude the Government from Eliciting Testimony about the Value of the Drugs

Hernandez anticipates that the government will attempt to admit expert testimony regarding the value of the seized controlled substance and that the amount was intended for distribution. During the process of qualifying the agent as an expert witness, however, the government will likely elicit lengthy testimony regarding the general structure and organization of a typical narcotics distribution organization. As discussed above, this testimony is improper and not related to the particular facts of the case before the court. Since such testimony will prejudice the jury against Hernandez by unfairly implying that they belong to a large narcotics distribution organization when no specific proof of that fact exists, this Court should exclude the testimony. FED. R. EVID. 401; 402; 403.

**1. Expert testimony about the value of the narcotics is irrelevant and prejudicial**

Testimony regarding the purported value of the drugs in this case has absolutely no bearing on whether Hernandez knew that the drugs were secreted within the vehicle he drove. Thus, the Court should exclude any such evidence. FED. R. EVID. 401, 402.

Moreover, even if this "value" evidence was relevant—which it is not—this Court must engage in a balancing test under Rule 403. As testimony about the wholesale value, or the street value, of the controlled substance would serve only to inflame and anger the jury, while offering negligible proof of guilt, it is improper under Rule 403. The Court, therefore, should specifically instruct the government not to attempt to elicit any expert testimony on this issue.

**2. The jury does not require expert testimony regarding the value of the narcotics or what constitutes a distributable amount of narcotics.**

When deciding whether to allow expert testimony, the district court must engage in "the common sense inquiry whether the untrained layman would be qualified to determine intelligently ... the particular issue without [expert] enlightenment ...." FED. R. EVID. 702 Advisory Committee Notes (quoting Ladd, Expert Testimony, 5 VAND. L. REV. 414, 418 (1952)). The district court should preclude unhelpful expert testimony because it is superfluous, prejudicial, and a waste of time. Id.

In this case, the government seized 43.44 kgs of alleged methamphetamine when its agents arrested Hernandez. Any testimony regarding the value of the alleged controlled substance will not serve to prove any element of the offense, but will only inflame the jury against Hernandez. Moreover, the simple question of whether the seized drugs is consistent with an amount intended for distribution is a

common sense inquiry that a lay juror may determine without the aid of expert testimony.

Since expert testimony regarding the value of the controlled substance and whether the amount of controlled substance in this case is consistent with an amount intended for distribution will not aid the trier of fact, but will only prejudice Hernandez and waste time, this Court should preclude the testimony.

**CONCLUSION**

For the above stated reasons, the defendant prays that this court exclude any drug expert testimony.

DATED: July 10, 2023 Respectfully Submitted,

Karren Kenney

KARREN KENNEY
Attorney for David Hernandez

# EXHIBIT A

# Memorandum

| Subject | Date |
|---|---|
| Disclosure | September 10, 2021 |
| To | From |
| Defense Counsel | United States Attorney's Office |

In late 2011 and early 2012, Homeland Security Investigations (HSI) came into possession of information that multiple drug trafficking recruiters in the Baja California border region have allegedly placed help wanted advertisements in Mexican publications. The advertisements were used to recruit drug couriers, although they appeared to offer employment. Recruiters or groups of recruiters paid the drivers hired through the advertisements (e.g., $100 or $200 per job) and the drivers did not know that they would be bringing drugs into the United States. Such an advertisement was allegedly placed in "La Frontera," and possibly in "El Mexicano."

HSI is in possession of information that, in or about May 2012, members of a transportation cell attempted to smuggle narcotics into the United States by concealing them inside a spare tire mounted on the exterior of a vehicle without the knowledge of the driver. The vehicle was to be driven from Mexico into the United States, where the tire would be removed and replaced with another spare tire while the driver was away from the vehicle. The vehicle was one that crossed into the United States at a predictable and regular time and parked at a predictable location.

HSI is in possession of information that, beginning in or about mid-2011, drug traffickers have attached magnets to packages of narcotics and placed them on the undercarriages of cars entering the United States from Mexico without the knowledge of the driver. The vehicles used for this smuggling method are typically those that have crossed into the United States at predictable times and park at the same location, typically the driver's place of employment.

In late 2018 and early 2019, the Drug Enforcement Administration (DEA) came into possession of the following information from a confidential source who provided reliable information in the past. Person 1, whose identity and a nickname are known, is in Mexico and has used others to smuggle drugs to the United States from Tijuana, Mexico by vehicle. Person 1 hired and told the drivers they would enter the United States to bring money back to Mexico from Riverside or Downey, California. Person 1 told the drivers to provide their vehicle a day or two before crossing so a compartment could be installed; in fact, the vehicle also was loaded with drugs. Once in the U.S., the drivers received texts directing them to a shopping center around Riverside or Downey where they parked the car with the keys inside. While the drivers shopped, others took the car to a different location, unloaded the drugs, and returned the car to the shopping center for the driver to take back to Mexico. Person 1 has worked with at least three others identified only by nickname and formerly worked with a fourth person whose identity is known. Person 1 is not known to be affiliated with a known drug cartel.

In November and December 2020, HSI came into possession of information regarding a drug-trafficking organization (DTO) in Tijuana, Mexico which is using unknowing drivers to smuggle narcotics into the U.S. by employing two schemes. In one scheme, the DTO works with corrupt Mexican law enforcement to set up traffic checkpoints. The corrupt officers target Ford F-150s, Nissan Sentras, and Toyota vehicles and place GPS devices in selected vehicles at the checkpoint (however, in one known instance, a Honda CRV was targeted). The DTO monitors the GPS devices to determine whether any of the vehicles are good candidates to be used for smuggling drugs into the U.S. If the DTO decides to use a vehicle, the drugs are placed in the spare tires or spare tire compartment without the knowledge of the driver. The DTO targets Ford F-150s because the drugs can be hidden and easily removed from the external spare tire. The DTO also targets Nissan Sentras and Toyota vehicles because it has the ability to make copies of those keys to allow access to the internal spare tires/spare tire compartments. In another scheme, the DTO works directly with valet staff at a Tijuana casino to obtain keys to vehicles that cross reliably into the U.S. – often through the San Ysidro Port of Entry. The DTO places the drugs in the spare tire or spare tire compartment along with a GPS device to track the narcotics loads. In addition to these methods, the DTO also uses knowing drivers and also installs GPS devices in their cars to track narcotics loads.

HSI and the San Diego Police Department (SDPD) are in possession of information involving four seizures of narcotics in which it appears that DTOs smuggled or attempted to smuggle narcotics loads by placing narcotics and GPS devices in the vehicles of individuals who reside in Mexico and regularly cross the border for work, without the knowledge of the drivers of the vehicles. In two of those seizures, once the driver arrived in the United States and parked his vehicle, other individuals working for a DTO attempted to remove the narcotics and GPS devices from the vehicle. In three of these seizures, the driver/owner of the vehicle contacted law enforcement to report the discovery of the drugs. All four drug seizures, summarized below, occurred during the period from June 2020 through July 2021:

- On June 24, 2020, an employee of a business in San Diego, reported to the SDPD that after she had driven her car from her Tijuana, Mexico residence to her San Diego place of employment, she discovered two duffle bags in the rear of her car. SDPD subsequently searched the car and found two duffel bags containing approximately 100 bindles of methamphetamine in her trunk and two different GPS tracking devices.

- On April 14, 2021, a driver and resident of Mexico was arrested at the San Ysidro Port of Entry (SYS POE) when CBP Officers discovered two duffle inside the spare tire well of her vehicle, which contained multiple packages consisting of approximately 10 kgs of methamphetamine, 6 kgs of heroin, and 5 kgs of fentanyl, along with a GPS tracking device. The driver denied knowledge and stated that the previous evening her car had been parked at her residence in Mexico where her spouse and another individual had been working on another car. HSI agents subsequently interviewed the spouse, who stated that he had placed the duffle bags and tracking device in his spouse's car without her knowledge. The spouse further stated that he had been approached by two drug traffickers who threatened to kill his family if he did not place the drugs in the car.

- On April 23, 2021, CBP Officers were contacted by a U.S. citizen and SENTRI pass holder who resides in Tijuana, Mexico and regularly drives to his business in San Diego, California. This individual told CBP that prior to leaving his Tijuana residence on the morning of April 23, he discovered packages underneath his pickup truck, located on top of the spare tire. The individual then agreed to drive his pickup to the SYS POE where CBP Officers discovered the four packages which contained approximately 4.5 kgs of cocaine. A GPS tracking device was also subsequently recovered from underneath the vehicle. With the individual's consent, HSI agents followed the individual as he drove his pickup to his San Diego business, where agents had set up surveillance. HSI agents subsequently arrested two off-loaders as they were attempting to retrieve the drugs from underneath the parked pickup truck. One of the off-loaders admitted that he was hired by drug traffickers to retrieve the drugs and knew that the pickup truck was equipped with a GPS tracking device. He further admitted that he had retrieved drug packages from the same pickup truck on 7 prior occasions. HSI agents viewed surveillance footage from the San Diego business which appears to depict this prior activity on several occasions.

- On July 13, 2021, CBP Officers were contacted by a U.S. citizen and SENTRI pass holder who resides in Tijuana, Mexico, and frequently crosses the border to travel to jobs at construction sites in the greater San Diego area. This individual notified CBP that he had discovered suspected narcotics packages concealed underneath his SUV, which was parked outside his Tijuana residence. The individual stated that in the early morning hours of July 12, he was awoken by a noise outside his residence which caused his dogs to bark, and he looked outside but did not see anything. The individual agreed to drive his SUV to the SYS POE where CBP Officers discovered three packages, attached underneath the rear of the SUV, containing approximately 1.6 kgs of methamphetamine and 685 gms of fentanyl. With the individual's consent, HSI agents followed the individual as he drove to a Home Depot parking lot in Chula Vista, where agents had set up surveillance. Approximately one hour later, HSI agents arrested two individuals as they were attempting to retrieve the packages from the SUV's undercarriage. In addition to the packages of drugs, agents recovered a GPS tracking device from the undercarriage. Following the arrest, agents recovered GPS tracking devices and magnets from the off-loaders' car. Both off-loaders admitted to working for a drug trafficking organization to retrieve drug packages from cars parked in the U.S. and both admitted that they had retrieved narcotics loads from several cars on multiple occasions since January 2021.

There is additional information which, although it may not be material to your client's case, could be disclosed to you. This information consists of Reports of Interviews of individuals in drug importation cases who: (1) have claimed to have responded to help-wanted newspaper advertisements (and some of the advertisements themselves); (2) have driven vehicles with narcotics concealed in the spare tire; (3) have knowledge of a person who recruited narcotics load drivers to cross into the U.S. by telling the drivers that they would be smuggling currency into Mexico; (4) have knowledge of a DTO that uses unknowing drivers to smuggle narcotics through the checkpoint by using corrupt Mexican law enforcement or casino employees, along with GPS devices; or (5) have had narcotics and GPS tracking devices placed in their vehicles in Mexico without their knowledge. However, the disclosure of the ROIs will require a Protective Order.

This information may exceed the scope of discovery mandated by law and, to that extent, is provided voluntarily and solely as a matter of discretion. By providing this information, the United States does not waive its right to object to any future discovery requests on this or other topics, and does not waive any objection to the admissibility of the above-referenced information.