RANDY S. GROSSMAN
United States Attorney
MICHAEL A. DESHONG
California State Bar No. 301041
ELIZABET F. BROWN
Assistant United States Attorney
Virginia Bar No. 95709
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-9290/8921
Michael.Deshong@usdoj.gov
Elizabet.Brown2@usdoj.gov
Attorneys for the United States

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>DAVID HERNANDEZ,<br><br>Defendant. | Case No. 22-CR-1913-BAS<br><br>**UNITED STATES' MOTIONS *IN LIMINE* to:**<br><br>**A. Preclude Evidence or Argument of Duress or Necessity;**<br>**B. Preclude Third-Party Culpability or "Blind Mule" Evidence;**<br>**C. Admit Defendant's Border Crossing History;**<br>**D. Admit Testimony to Authenticate Defendant's Cellular Phone Extraction;**<br>**E. Admit Evidence of Prior Smuggling Event;**<br>**F. Admit United States' Expert Testimony; and**<br>**G. Admit Excerpts of Defendant's Statements If Offered by the Government.**<br><br>DATE: July 24, 2023<br>TIME: 11:00 a.m. |

The United States of America hereby files its Motions *in Limine*.

**I.**

**STATEMENT OF THE CASE**

On June 7, 2022, David Hernandez (Defendant) was arrested for and later charged in a complaint with a violation of 21 U.S.C. § 952 and 960, Importation of Methamphetamine. ECF 1 (Case 22CR1443). On June 30, 2022, Defendant waived indictment and was arraigned on an Information charging the same. ECF 18-19 (Case 22CR1443). On August 18, 2022, Defendant was indicted in the case herein on the same charge with an allegation that he imported 500 grams and more of a mixture and substance containing a detectible amount of methamphetamine. ECF 1 (Case 22CR1913). The matter is set for a jury trial to commence on August 29, 2023, at 9:00 a.m.

**II.**

**STATEMENT OF FACTS**

**A. Defendant Arrested With Approximately 40 kg of Methamphetamine**

On June 7, 2022, at about 4:25AM Defendant entered the United States at the Otay Mesa Port of Entry (POE). Defendant, a United States citizen, was the driver of a Ford E-150 van, and Defendant's wife was the passenger. Defendant was awaiting primary inspection when a Canine Enforcement Team dog alerted to the undercarriage of the car, then specifically to the external spare tire attached to the undercarriage. Customs and Border Protection Officer (CBPO) Falero noticed that the spare tire tapped solid, tool markings and fresh fingerprints on the spare tire rim, a shiny black silicone substance around the inside seam of the tire and rim, and fresh tool markings and scuff marks on and around the gas tank, which also tapped solid. Defendant thereafter told CBPO Mansouri that he was going to Fontana and provided two negative customs declarations.

The car was screened by a Z-Portal X-ray machine, which detected anomalies in the spare tire and gas tank. A subsequent search revealed 10 packages in the spare tire and 80

packages in the gas tank, in addition, the mechanic removed 15 gallons of gas from the tank. An officer and the mechanic also noticed that the gas gauge was not working. The packages weighed a total of 43.44 kg (95.76 lbs.), and field tested positive for methamphetamine. Later testing by the Drug Enforcement Administration laboratory confirmed the substance was methamphetamine. Defendant was arrested for importation of methamphetamine.

**B. <u>Defendant's Post-Arrest Interview</u>**

Homeland Security Investigations (HSI) Special Agents Mark Jay and Thomas Strode conducted an interview after Defendant waived his *Miranda* rights.

Defendant initially claimed he went to the Department of Motor Vehicles in the U.S. the day before his arrest, and then returned home, did yard work, and went to Rosarito with friends. He said they returned home close to midnight. He said the load van remained by his house and stayed there until Defendant left the morning of the arrest. When asked if the van had been anywhere else, he said he had taken it to the mechanic a week earlier, initially struggling to remember if it was two days or a week.

Defendant said the van had the check engine on, and that the mechanic was doing "the whole service." When questioned, Defendant also mentioned the spark plug and admitted that the mechanic did *not* fix the check engine light, even though that was the purpose of the trip to the mechanic. Defendant claimed that he went to buy the part for the spark plug, that the shop did not have a name as it was "just some people working there," and that he did not know how much the fix-up cost as he did not have a receipt.

Defendant asserted that the gas gauge on the van worked, repeating this multiple times, even when confronted with his wife's statement that it did not work. Defendant first said he did not know why she would say that, confirmed his prior statement that the gas gauge did not work, before admitting that the gas gauge was broken.

Defendant admitted that the people at the mechanic "offered (him) something like that, (…) but that they never say drugs," and that they offered him a job driving money, less than $10,000, across the border from the United States to Mexico, but that he said he was not interested. He admitted that he was going to take the van to the Compton area of Los Angeles

on the day of arrest and that the mechanic would call him with the address and then fix the van. Defendant claimed he did not know the mechanics name nor phone number, but that the number was in his phone, though he could not identify what name it was saved under. Defendant denied ever having done this before and claimed they tricked him. Defendant said that in the beginning he was excited because all he had to do was drive their car and he was befriending his neighbors. He admitted that they "talked about bringing "money and drugs into over here," and that they asked him to bring money back to Mexico. Defendant said he would have been paid $5,000 for two trips where he was supposed to drive into the United States and meet someone, then drive his car back to Mexico to meet another person, and then drive back into the United States a second time. He said they explained that he would bring $9,000, which was okay, and that it was $10,000 that was illegal. Defendant admitted he said no because he thought they might "put something the car." He admitted that they talked about drug smuggling and that he "guess(ed) that they wanted (him) to hear it, but (he) kind of, ignore(d) it." He said he had not asked them not to put drugs in the car because he "never thought they would."

Defendant said the cash in his pocket came "from them," because he "took money to them" from the U.S. to Mexico about a week ago to the shopping center in Los Angeles, where they picked up the car and took it someplace else. He claimed he went with the mechanic down an alley with shops and that they ate somewhere while the van stayed. He said they paid him $2,000 in cash. Defendant admitted that he did not see the cash last time, "(b)ecause they told (him) they had to hide it from" him.

This time, Defendant said they had told him they were going to fix the gas tank. Defendant admitted that he "lied (about) the gas tank," earlier in the interview, but would not say why. Defendant said that he is the one that puts gas in the van, then saying that "they" told him to get gas after he got the van the day of the arrest and that they were with him when he filled it up. Defendant admitted that he was going to the same place "to pick up some money and bring it to them" on the day of arrest. He claimed they had tricked him. Yet later he also said he "was going to drop off the damn drugs," clarifying that he guessed he was dropping

off what the agent "found in the car." Agent Jay asked if Defendant had been told there would be a tracker on his car, and once asked, Defendant said they had mentioned a tracker and that he left the car with them to get a tracker installed when he was in LA.

At the end, defendant agreed that he "knew these guys were involved in drug smuggling and dealing with some sort of cash smuggling. And they hired (him) to drive to LA, pick up the cash, (and) take the cash back here to them. And then (…) they were going to pay (him) $2,000 dollars." He said that "this trip, (he) was going to pick up cash." When asked why he would have to smuggle the money if it was legal, Defendant said he did not know, and then he guessed that "it was dirty money or they couldn't bring it over." Defendant said he walked away whenever they talked about that, as he did not "want to be stuck in something." Defendant admitted they had asked him to move drugs before, but that he "told them, look what happened to this guy, and you want me to move all this? No. (…) forget it, man. I don't want to." Defendant claimed they had talked about sending a girl and how "she brings it over and right now she's driving (…) this car, but that they did not "tell (him) the (type) of drugs. He also said he left the conversation when they started talking about how much she made, because he was "not interested" and already told (them) no." Defendant claimed that he had "figured it out (him)self," thanks to the Agent, and that it was "a puzzle when (they) were putting it together."

**C. Defendant's Border Crossing History**

In the weeks leading up to his arrest, Defendant repeatedly drove the load van across the border, in addition to his motorcycle. Defendant's wife was often present when he drove the load van across the border, but the van never crossed the border without Defendant present. On two occasions in the month leading up to his arrest, Defendant walked north across the border into the United States and then the load van drove south into Mexico a short while later (approximately 15 minutes and 1.5 hours, respectively).

**D. Defendant's Prior Trip to Los Angeles on June 1-2, 2022**

At the time of Defendant's arrest, an Apple iPhone was seized from him. Text messages, call logs, and GPS coordinates from Defendant's cell phone indicate he previously

drove the load van into the United States on June 1, 2022, and arranged to meet with someone at a shopping center in Lynwood, California—near Compton. After the meeting, Defendant spent some time at the address on Bewley Street in Santa Ana where he registered the car before heading south to Mexico. On the way to Mexico, Defendant ran out of gas and called 911 for assistance. A driver from Road One Towing responded to assist Defendant.

***June 1, 2022: Defendant Crosses and Drives to Shopping Center in Los Angeles***

Border crossing records show that Defendant and his wife crossed the border into the United States at approximately 8:10 a.m. on June 2, 2010. At approximately 9:25 a.m., his phone pinged with the GPS coordinates (33.190735, -117.361196), which Google Maps indicates is near the intersection of the I-5 Freeway and Oceanside Boulevard. There is a GM Gas station at that freeway exit. A few minutes later, at 9:37 a.m., Defendant took a photograph of a gas pump indicating he had purchased 18.7 gallons of gas. A "GM" logo is visible on the pump. While Defendant was at the gas station, he received four short calls from a Mexican number ending in -2120. As Defendant's location pings indicated he traveled north to Santa Ana, California, he continued to exchange calls with the -2120 number. Defendant called the number at 11:22 a.m. and spoke with the number for 4 minutes and 18 seconds, and then the -2120 number called Defendant twice at 11:28 and 11:41 a.m. At 11:43 a.m., the -2120 number messaged Defendant another number: 424-567-1708 (the "-1708" number). A short time later, at 11:56 a.m., Defendant called the -1708 number and they spoke for 56 seconds.

Defendant's location data shows he was traveling from Santa Ana to Los Angeles when the -1708 number sent him the address "3100 E Imperial Hwy, Lynwood, CA 90262" at 12:58 p.m. This address corresponds with the Plaza Mexico shopping center in Lynwood, California. At 1:17 p.m., Defendant's location data indicates that he arrived at the Plaza Mexico shopping center. For more than two hours, Defendant's location data indicates he remained at the Plaza Mexico shopping center and he continued to communicate with the -2120 and -1708 phone numbers. At 2:26 p.m., Defendant took a photograph that corroborates his presence at the Plaza Mexico shopping center.

| | |
|---|---|
| ***Photo Taken from Defendant's Phone on June 1, 2022, at 2:26 p.m.*** |  |
| ***Google Street View Image of Statue at the Plaza Mexico Shopping Center*** |  |

At 4:05 p.m., the -1708 number messaged Defendant "In 30 min, I'm there." After the 30 minutes passed, at 4:37 p.m., Defendant called the -2120 number and they spoke for 1 minute and 37 seconds. At 4:54 p.m., the -1708 number reached out again to message Defendant he/she would be in the same place in five minutes. Defendant responded to say he

would wait. After this meeting, Defendant's location data shows he traveled south to the address on Bewley Street in Santa Ana, arriving shortly before 7:00 p.m.

***June 2, 2022: Defendant Runs Out of Gas While Driving Back to Mexico***

According to his phone's location data, Defendant remained in the Santa Ana area until he began traveling south on the I-5 Freeway at approximately 1:40 a.m. Shortly after 2:00 a.m., Defendant's phone took a number of photos indicating the car was traveling on a freeway but the images are too blurry to read any of the freeway signs. At approximately 3:22 a.m., Defendant's phone indicates that he called 911 and spoke with an operator for approximately 3 minutes and 16 seconds.

At the time of his arrest, Defendant had a receipt from Road One Towing indicating his car ran out of gas on the I-5 Freeway Southbound near Oceanside, California. The receipt indicates that the call was received at 3:31 a.m. on June 2, 2022, or shortly after Defendant's phone called 911. The receipt indicates the tow driver charged Defendant for 2 gallons of gasoline and includes Defendant's name, address, and a description of the load van and its license plate. The United States obtained certified business records from Road One Towing that contain essentially the same information. Border crossing records indicate that the load van crossed the border back to Mexico at approximately 7:36 a.m.

## III

## MOTIONS *IN LIMINE*

### A. Preclude Evidence or Argument of Duress and Necessity

Courts have previously approved the pretrial exclusion of evidence relating to a legally insufficient duress defense on numerous occasions. *See, e.g., United States v. Bailey*, 444 U.S. 394, 409-12 (1980) (escapee defendant failed to proffer evidence of a bona fide effort to surrender or return to custody as the claimed duress or necessity had lost its coercive force); *United States v. Moreno*, 102 F.3d 994, 997–98 (9th Cir. 1996) (drug courier defendant failed to show that he did not have the opportunity to escape the threatened harm). A district court may preclude a necessity defense where "the evidence, as described in the defendant's offer

of proof, is insufficient as a matter of law to support the proffered defense." *United States v. Schoon*, 971 F.2d 193, 195 (9th Cir. 1992).

If Defendant fails to make a threshold showing as to each and every element of the defense, defense counsel should not burden the jury with testimony or comments relating to such a defense. *See, e.g., Bailey*, 444 U.S. at 416 (explaining that if testimony supporting one element of a duress defense is insufficient to sustain it, "the trial court and jury need not be burdened with testimony supporting other elements of the defense"); *United States v. Dorrell*, 758 F.2d 427, 430-31 (9th Cir. 1985).

The United States moves to preclude Defendant and defense counsel from eliciting any testimony, making any comment, or presenting any argument relating to an alleged defense of "duress," "coercion," or "necessity" unless Defendant makes a prima facie showing satisfying every element of the defense. The United States requested reciprocal discovery and has not received any discovery relating to a duress or necessity defense. The United States requests that the Court rule on this issue before trial to avoid the danger of unfair prejudice, confusing the issues, misleading the jury, and undue delay; especially considering the nature and extent of duress or necessity evidence, and the prejudicial effect it may have on jury.

**B. <u>Preclude Third-Party Culpability or "Blind Mule" Evidence</u>**

Defendant recently requested discovery from the Government regarding other cases where there were allegations that individuals were "blind mules." As a result, the Government anticipates that Defendant may seek to present purported evidence of third-party culpability at trial. In anticipation, the Government seeks to preclude or limit Defendant's presentation of such evidence unless and until he can establish relevance, admissibility, and mitigate the risk of confusing the jury.

Unless Defendant provides substantial evidence that a particular third party was involved in Defendant's importation of methamphetamine, Defendant should be precluded from introducing evidence or eliciting testimony, either on cross-examination or in his case-in-chief, about general allegations regarding the use of "blind mules." Moreover, the Court should preclude evidence and testimony regarding the arrests of other persons—in so-called

"blind mule" cases—that are not related to Defendant or his arrest. Such fact-intensive arrests are too remote to have any probative value in Defendant's particular case. In contrast, if Defendant wishes to blame the mechanic he allegedly allowed to work on the car, there would be a sufficient factual nexus to the case to render it relevant.

The Ninth Circuit has limited what evidence may be considered relevant and admissible under the theory of third-party culpability. In *United States v. Vallejo*, 237 F.3d 1008, 1023 (9th Cir. 2001), the seminal case on third-party culpability, the Ninth Circuit permitted admission of relevant evidence that tended to prove that a person other than the defendant was responsible for importing a controlled substance. In *Vallejo*, the defendant was able to draw significant similarities between himself and a third party, including evidence that the third party was arrested for importing almost the same quantity of marijuana, the marijuana was hidden in similar compartments, both arrests occurred at the same port of entry, the arrests occurred within one month and four days of each other, and the third party was the former owner of the vehicle the defendant was driving and had executed a release of liability of the vehicle less than two weeks before the defendant's arrest. *Id.* Altogether, the Court found that the circumstances infused this evidence with the unique relevance to the central defense theory that Vallejo did not know of the drugs in the car. *Id.*

The Ninth Circuit has determined that where the proffered third-party evidence simply affords a possible ground of suspicion pointing to a third party and does not directly connect that person with the actual commission of the offense, that evidence may be excluded. *See Guam v. Ignacio*, 10 F.3d 608, 615 (9th Cir. 1993) ("Evidence of third-party culpability is not admissible '. . . [unless it is] coupled with substantial evidence tending to directly connect that person [(the third party)] with the actual commission of the offense.'") (applying Federal Rules of Evidence) (*quoting Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir. 1983)); *see also Walters v. McCormick*, 122 F.3d 1172, 1177 (9th Cir. 1997).

Even evidence of another person's similar arrest is generally too remote to be relevant. *See, e.g.*, *Vallejo*, 237 F.3d at 1022–24 ("Ordinarily evidence of another person's similar arrest may be too remote . . ."). Without some link, factual or temporal, to the offense in this case,

evidence and testimony concerning defendants in other investigations and prosecutions is not relevant to the only question at issue: Did this defendant know he was importing methamphetamine?

As *Guam* and related cases on third party culpability make clear, without some *substantial* link, factual or temporal, to the offense in this case, evidence concerning other investigations and prosecutions is not relevant in this case. Unrelated cases involving unrelated defendants distant in time simply cannot assist the trier of fact in answering the question of Defendant's personal knowledge. Indeed, evidence on direct or cross-examination about other defendants' states of mind in unrelated cases is analogous to offering expert testimony on knowledge, which is expressly disallowed by Federal Rule of Evidence 704. The rationale is straightforward: Neither an expert nor other, unrelated defendants' knowledge can make it any more or less probable that defendant knew there were drugs in his car.

Unless Defendant makes the requisite substantial showing of a third-party culpability defense, this Court should preclude him from presenting evidence or eliciting testimony alleging that third parties were "blind mules" and using it to imply or argue that Defendant is therefore also a "blind mule."

**C. Admit Defendant's Border Crossing History**

The United States has produced border crossing records for Defendant, the load van, and a motorcycle sometimes used by Defendant. The United States seeks to introduce these records to show Defendant's dominion and control over the vehicle and lack of predictable pattern in his border crossing. The United States will also seek to introduce these crossing records to contradict Defendant's post-arrest statements that he was not using the load van the day before his arrest because it needed mechanical work and that he left it with a mechanic.

Defendant's use of the load van is inextricably intertwined with the offense charged. Defendant's border crossings are inextricably intertwined with the offense charged. There are two general categories of inextricably intertwined evidence: (a) evidence that constitutes part of the transactions serving as the basis for the crime charged; and (b) evidence that may be necessary for "the prosecutor to offer a coherent and comprehensible story regarding the

commission of the crime." *United States v. Dorsey*, 677 F.3d 944, 951 (9th Cir. 2012). Inextricably intertwined evidence does not implicate Rule 404(b). *Id.*

The Ninth Circuit has held that the crossing history of an individual and a vehicle from TECS records is relevant, admissible evidence of dominion and control of the vehicle from which the jury can infer knowledge of the contraband. *See United States v. Jimenez*, 506 Fed. Appx. 576, 578 (9th Cir Jan. 25, 2013) (unpublished); *United States v. Haro-Portillo*, 531 F.2d 962, 963 (9th Cir. 1976) (stating that knowledge of contraband contained in vehicle can be inferred from dominion and control over vehicle). The TECS records of Defendant's border crossings demonstrate his continued control of the drug vehicle. This evidence should be admitted for these purposes. Defendant's crossing records, and the vehicle's crossing records, should also be admitted to establish a pattern of movement for the Defendant.

**D. <u>Admit Testimony to Authenticate Defendant's Cell Phone Extraction</u>**

The United States will seek to admit evidence recovered from Defendant's cell phone during its case-in-chief. The evidence was obtained and downloaded pursuant to a search warrant by Homeland Security Investigations Special Agent Scott Lensky. Special Agent Lensky works at HSI's Cyber Crimes Center and connected Defendant's cellular phone to a forensic application that extracted files from it and saved them to disk. Special Agent Lensky wrote a report documenting the extraction, which was produced in discovery (bates 697–99). Authenticating a phone download that was obtained in this manner does not require expert testimony. *United States v. Seugasala*, 702 F. App'x 572, 575 (9th Cir. 2017) (unpublished) ("The officers who followed the software prompts from Cellebrite and XRY to obtain data from electronic devices did not present testimony that was based on technical or specialized knowledge that would require expert testimony."). In this case, Special Agent Lensky's testimony would be limited to merely authenticating the disk containing the data he extracted from the cellular telephone. The case agent, Special Agent Mark Jay, would then testify regarding his review of the data and to offer any specific exhibits that the United States would seek to admit into evidence.

**E. Admit Evidence of Prior Smuggling Event**

The Court should admit evidence of Defendant's prior border crossing on June 1, 2022, and the events following on June 2, 2022, pursuant to Federal Rules of Evidence 404(b). The evidence shows knowledge, absence of mistake, and lack of accident. The events on these dates are part of single trip. As set forth above, the United States seeks to use border crossing records, call logs, images, text messages, and location data from Defendant's cellular phone, and certified business records from Road One Towing to present the narrative of these events to the jury. During closing arguments, the United States will argue that Defendant's prior trip to Los Angeles contradict his post-arrest statement that he must have been set up by his mechanic and show he lied when he denied being aware of any issues with the fuel gauge on the load van. Further, the timeline of Defendant's trip contradicts his claim that he brought the car into the United States to have money concealed inside it. After Defendant left the Plaza Mexico shopping center at approximately 5:00 p.m., he drove to Santa Ana and spent close to 7 hours driving around and spending time at a residence before he drove home. If his car had just been loaded with "dirty money," then presumably the owners of the money would have wanted him to promptly deliver it to them.

Evidence of a prior act is admissible under Rule 404(b) if "(1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged." *United States v. Bailey*, 696 F.3d 794, 799 (9th Cir. 2012) *citing United States v. Romero*, 282 F.3d 683, 688 (9th Cir.2002*)*. In evaluating 404(b) evidence, a court must then evaluate the evidence under rule 403 and determine "whether the probative value is substantially outweighed by the prejudicial impact." *Id.*

***Evidence Regarding Prior Drug Delivery on June 1, 2022***

The Court should permit the United States to introduce border crossing records and evidence from Defendant's phone—as set forth in the Statement of Facts—to present this narrative. First, the prior trip goes directly to Defendant's knowledge and lack of mistake. Contrary to Defendant's assertions that he was "set up," this prior trip shows him

communicating with a Mexican phone number (the -2120 number), being referred to a U.S.-based phone number (the -1708 number), then being sent an address where he waited for more than two hours until he was sent a text message to meet in the "same place." The United States will argue that this evidence indicates that Defendant was a knowing and active participant in cross-border drug smuggling and not "set up" as he claims. Second, these events occurred less than one week before Defendant's arrest and are not too remote in time. Third, Defendant ultimately admitted that he drove to a shopping center in Los Angeles (where Defendant claimed he was distracted while his van remained in place). Fourth, this act is virtually identical to the offense charged because both involve Defendant driving his van across the border and turning it over to others in the United States to have drugs removed from it. Accordingly, the Court should allow the United States to present evidence of Defendant's actions on June 1, 2022.

***Defendant's Return To Mexico on June 2, 2022***

For similar reasons, the Court should permit the United States to admit evidence regarding Defendant's return trip to Mexico after he went to Los Angeles on June 1, 2022. This evidence is relevant because it is inconsistent with Defendant's claim that he was going to have money placed in the car to smuggle back to Mexico. The evidence indicates Defendant left the shopping center in Los Angeles around 5:00 p.m., then stayed around Santa Ana from 7:00 p.m. to around 1:40 a.m. before driving back to Mexico. Defendant spending close to 8 hours (7:00 p.m. to 1:40 a.m.) in the United States is inconsistent with his claim that his vehicle was loaded with dirty money that needed to be delivered back to Mexico, but consistent with the Government's theory that he was delivering drugs. Once the drugs were removed from Defendant's vehicle in Los Angeles, he was no longer carrying valuable cargo and permitted to make the return trip to Mexico at his leisure. Further, this return trip involves Defendant running out of gas on the side of the freeway and having to call for assistance—an event that surely would have put him on notice that is gas gauge was not functioning. Thus, this event is also relevant to prove Defendant lied during his post-arrest to conceal his prior knowledge that there were issues with his gas tank. In closing argument, the United States will argue he lied

about this point to conceal that he was on notice that the gas tank had been tampered with. While Defendant ultimately admitted to lying about this issue during his post-arrest interview, his call to 911 and the evidence regarding the roadside assistance is still relevant to show his lie was not an honest mistake. He had just been stranded on the side of the freeway at 3:30 in the morning and had to call 911 for help. That is not an experience most people are likely to "forget" within a week.

***Rule 403 Analysis***

The evidence also survives Rule 403 analysis, as its probative value substantially outweighs the prejudicial effect. *See United States v. Arambula-Ruiz*, 987 F.2d 599, 602 (9th Cir. 1993). The evidence goes squarely to Defendant's knowledge and lack of mistake in smuggling drugs, whether his actions were consistent with a person smuggling drugs north or cash south, and as to whether he lied to conceal his prior knowledge that the gas gauge was not working. Any prejudicial effect—though the United States contends that there is none —can also be obviated by instructing the jury that it is to consider the evidence for the limited purposes of knowledge, absence of mistake, and lack of accident.

**F. Admit United States' Expert Testimony[1]**

The United States expects to elicit testimony from witnesses that the Court may deem to be expert testimony. If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question. Fed. R. Evid. 702. The trial judge is the gatekeeper regarding the type and scope of expert testimony that should be admitted in any particular trial.

[1] Defense has indicated via email that they will agree to a stipulation as to the lab results. The United States anticipates a stipulation as to how much of the substance found in Defendant's car was tested and that it was determined to be methamphetamine, a Schedule II controlled substance, at a 100% purity. If there is a stipulation, the United States does not intend to call Drug Enforcement Administration forensic chemist Layne Ashley Higgins. The United States provides this notice out of an abundance of caution. If the chemist testifies, the United States anticipates that she would testify that she performed various tests on the substance seized from Defendant's vehicle and that these tests indicated that the substance was methamphetamine. The chemist will also testify to the net weight of the drugs and their purity. The expert will base her opinions on her background, education, and experience, along with her knowledge and use of accepted scientific methods of testing. This testimony bears directly on an element of the charged offense that methamphetamine is a prohibited drug.

and has "broad latitude" in determining the relevance and reliability of such testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). The expert may base his opinion on hearsay or facts not in evidence when the facts or data relied upon are of the type reasonably relied upon by experts in the field. Fed. R. Evid. 703. An expert may provide opinion testimony even if the testimony embraces an ultimate issue to be decided by the trier of fact. Fed. R. Evid. 704; *United States v. Plunk*, 153 F.3d 1011, 1018 (9th Cir. 1998).

**1. Testimony from Automotive Expert**

The Court should permit John Louie to testify as an automotive expert. The United States has produced Mr. Louie's written report regarding his testimony (starting at Bates 219) and Mr. Louie's resume and photographs he took of Defendant's van. Mr. Louie has repeatedly been qualified as an auto mechanic and auto body expert, for both the prosecution and the defense. Mr. Louie's testimony will cover his review of the law enforcement reports and photographs of the load vehicle from the day of Defendant's arrest, the findings of his online research and personal physical inspection of the load vehicle, and the tools, labor, and time necessary to conceal and to remove the methamphetamine seized from the fuel tank and spare tire of the load vehicle. Mr. Louie's opinions are based on his background, education, experience, and training.

Among other things, Mr. Louie will testify that the only way to access the load van's fuel tank would be to have remove the entire fuel tank from the frame of the van. Further, Mr. Louie will testify that the van's fuel pump and sending unit were disconnected, which would have prevented the fuel gauge from reading properly. Mr. Louie's report notes that the fuel gauge indicated the tank was empty both at the time of Defendant's arrest and during Mr. Louie's inspection.

**2. Evidence Regarding Value of the Controlled Substance**

The United States seeks to admit testimony from Special Agent Jamisha Johnson regarding the wholesale and retail value of the methamphetamine found in Defendant's Ford E-150 van. This testimony is strong circumstantial evidence of Defendant's knowledge of the drugs secreted in his vehicle. The Ninth Circuit permits the use of expert testimony regarding

drug value to show a defendant's understanding and awareness. *See United States v. Sepulveda-Barraza*, 645 F.3d 1066, 1068 (9th Cir. 2011); *United States v. Savinovich*, 845 F.2d 834, 838 (9th Cir. 1988) (price, quantity, and quality of narcotics are relevant to demonstrate defendant's knowledge of the drugs and intent to distribute them); *United States v. Kearney*, 560 F.2d 1358, 1369 (9th Cir. 1977) (street value of narcotics is relevant to demonstrate defendant's knowledge); *United States v. Gil-Garcia*, 769 F. App'x 479, 2019 WL 1953735 (9th Cir. May 1, 2019) (unpub).

Further, both forms of information are relevant and the Court should permit both. The wholesale value shows what the importers were likely to earn from the courier's efforts (before costs), and the retail value shows what direct purchasers of the drugs were likely to earn. They show both that the organization had a direct stake in Defendant's success for their own profit, and a stake in satisfying their wholesale customers. A copy of Special Agent Johnson's value charts and resume have been produced in discovery. Admitting both wholesale and retail value would not be unduly cumulative or more prejudicial than probative of Defendant's knowledge. Thus, both should be admitted under Rules 401 and 403.

This expert testimony is also reliable. An experienced narcotics agent may testify in the form of an opinion, even if the agent bases his or her opinion on information from other agents familiar with the issue. *See Golden*, 532 F.2d at 1248. Here, the Agent will use the DEA lab report of the drug sample, a "Street Drugs Price List" published by the San Diego Law Enforcement Center, and her own knowledge, training, and experience to determine the street or retail value of the methamphetamine in the car. The Agent may offer this opinion after being asked to assume hypothetical facts. Accordingly, the Court should admit the testimony as both relevant and reliable.

**3. If Defendant Opens the Door, Structure/Modus Operandi and "Blind Mule" Expert Testimony**

Although the United States does not intend to introduce such evidence unless Defendant puts these items at issue, it is still alerting the Court regarding the nature of the testimony it might seeks to present on the structure of DTOs and blind mules.

Evidence about DTO structure will include that DTOs frequently use a division of labor in their efforts to smuggle drugs into the United States. DTOs typically utilize different people to install non-factory compartments into vehicles, obtain and register vehicles for the transportation of narcotics, load drugs into the vehicles in Mexico, transport the drugs into the United States, and unload the drugs in the United States. The Ninth Circuit permits structure testimony if relevant to the issues and not otherwise excludable under Rule 403. *See, e.g., United States v. Valencia-Lopez*, 971 F.3d 891, 901 (9th Cir. 2020) ("We do not question that expert modus operandi testimony is admissible in drug smuggling cases involving unknowing or coerced couriers"); *United States v. Venegas-Reynoso*, 524 F. App'x 373, 375-76 (9th Cir. 2013) (structure testimony properly admitted to rebut defendant's claim that he was a blind mule); *United States v. Alatorre*, 222 F.3d 1098, 1110 n. 3 (9th Cir. 2000) (structure testimony properly admitted after defendant opened the door by raising a fingerprints issue); *see also United States v. Ordonez*, 474 F. App'x 670, 671 (9th Cir. 2012)(unpublished) (explaining "a defendant need not 'open the door' to expert testimony [on the modus operandi of drug trafficking organizations] by doing more than arguing that he or she lacked knowledge of the drugs").

As to blind mule testimony, the United States does not intend to elicit testimony concerning blind mules in its direct examination of its expert. However, the United States does reserve the right to ask questions of its expert concerning blind mules if defense were to open the door on cross-examination of its expert or based on other evidence elicited by defense at trial. The Ninth Circuit has frequently upheld blind mule testimony if the issue becomes relevant at trial. *See, e.g., United States v. Cordoba*, 104 F.3d 225, 229 (9th Cir. 1997) (upholding testimony that sophisticated narcotics traffickers do not entrust 300 kilograms of cocaine to someone who does not know what he is transporting), abrogated on other grounds in *United States v. Valencia-Lopez*, 971 F.3d 891 (9th Cir. 2020); *United States v. Castro*, 972 F.2d 1107, 1111 (9th Cir. 1992) ("[E]xperts testified that the amount of cocaine, valued in the millions of dollars, would have never been entrusted to an unknowing dupe. Based on that testimony the jury reasonably could have found that [defendant] knowingly possessed the

cocaine."), abrogated on different grounds in *United States v. Jimenez Recio*, 537 U.S. 270 (2003); *see also United States v. Sepulveda-Barraza*, 645 F.3d 1066, 1072 (9th Cir. 2011) (rejecting argument that expert's testimony that a DTO is unlikely to use an unknowing drug courier is per se inadmissible in a non-complex drug trafficking case; "Testimony regarding the use of unknowing couriers… is admissible under the broad, case-by-case standard of Rule 403").

If the door is opened, the United States intends to elicit testimony about how DTOs are structured to compartmentalize the roles that individuals play. The relevance of such testimony depends on what argument or evidence is offered at trial, such as to rebut claims of improper investigative work, *see Alatorre*, 222 F.3d at 1100, or that the importer did not know drugs were inside the vehicle, *Venegas-Reynoso*, 524 F.3d at 367.

**4. English Translations of Spanish-Language Evidence**

The United States intends to offer the testimony of certified interpreter Aisha Smith. She will testify to English translations of Spanish language evidence in this case, including text messages and audio messages from Defendant and Nereyda's cell phone and Nereyda's post-arrest statement (if admitted). The translations are based on the application of the interpreters' knowledge, experience, training, and education. The United States has produced of the interpreter's curriculum vitae, interpreter certifications, and prior experience testifying.

The United States respectfully requests the right to offer additional expert testimony from one of these interpreters should Defendant seek to admit translations that Defendant has not previously identified and to which the parties have not stipulated if the Court permits Defendant to introduce such evidence.

**G. <u>Admit Excerpts of Defendant's Statements If Offered by the Government</u>**

The United States may seek to admit into evidence Defendant's statements to the Customs and Border Protection Officers he encountered on the day of his arrest and Defendant's post-arrest statements.

These statements are relevant under Federal Rule of Evidence 401 because each goes to proving the ultimate facts in dispute: whether Defendant knowingly imported a controlled

substance into the United States on November 6, 2022. Additionally, the statements are "not hearsay" under Federal Rule of Evidence 801(d)(2)(A) because each will be offered by the United States against Defendant. Subject to the United States laying a proper foundation for each, the United States asks the Court to admit these statements.

The United States seeks to introduce portions of Defendant's post-arrest statement that it may seek to offer into evidence in its case-in-chief. While Defendant was in custody, he provided a knowing and intelligent *Miranda* waiver and there were not threats or undue coercion to render his waiver, or the subsequent statements involuntary.

Specifically, the United States may seek to introduce Defendant's post-arrest statement. In summary, Defendant recounted the day prior to his arrest, that he was going to Santa Ana the day of arrest, that the van had been with a mechanic and that he was going to see a mechanic in LA. Defendant gave differing answers as to what the issues were with his car and what he was doing the day of the arrest, in the end admitting he knew the gas gauge was faulty and claiming that he thought he was moving money south for individuals involved in drug trafficking. Rather than playing the lengthy post-arrest in its entirety, the United States will create clips of Defendant's post-arrest statement and play them for the jury to present Defendant's post-arrest statement in a manner that makes it accessible to the jury.

The United States will provide Defendant's counsel with the clips it intends to play in advance of trial. The United States notes that Rule 106, or the "Rule of Completeness" does not require the Government to play Defendant's post-arrest in its entirety nor does it give Defendant an "end run" around the hearsay rules that preclude him from admitting his own prior statements. To the extent Defendant believes his post-arrest statements are being presented in a misleading manner, he may raise any objections once he has reviewed those clips.

To the extent Defendant seeks to offer his own statements, the Court should exclude those statements as self-serving hearsay. *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *see also United States v. Lopez*, 913 F.3d 807, 826 (9th Cir. 2019) (observing that a defendant could not admit an entire recorded interview he had with agents, because it would

constitute admission of her own hearsay statements). Otherwise, Defendant could place his exculpatory statements before the jury without subjecting himself to cross-examination, "precisely what the hearsay rule forbids." *Id.* (quoting *United States v. Fernandez*, 839 F.2 639, 640 (9th Cir. 1988). If Defendant wishes to place a claimed lack of knowledge before the jury, he must testify and subject himself to cross-examination; he may not place the notion before the jury through cross-examination of the Government's witnesses, or by having other witnesses testify about exculpatory statements that he may have made. *See Ortega*, 203 F.3d at 682 (barring admission of exculpatory statements through cross-examination of Government witnesses).

For the same reasons, the Court should not permit Defendant to take improper advantage of the Rules of Evidence. Since the Rules do not permit Defendant to introduce his own statements, it follows that Defendant should not be permitted to comment before the jury in a way that suggests the United States is somehow "hiding evidence" from them, or in some other fashion to suggest that the United States is depriving them of evidence of his statements. Nor should Defense counsel be permitted during opening statements or closing arguments from quoting or alluding to statements by Defendant that Defendant will not or has not introduced into evidence.

DATED: July 10, 2023

Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

/s/ *Elizabet F. Brown*
ELIZABET F. BROWN
Assistant U.S. Attorney

/s/ *Michael Deshong*
MICHAEL DESHONG
Assistant U.S. Attorney